**Exhibit R**

Teresa Denise Ferguson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION
CASE NO. 7:18-CV-02957-TMC-KFM


SUMMER D. LASHLEY, PH.D.,
                    Plaintiff,
          vs.
SPARTANBURG METHODIST COLLEGE;
W. SCOTT COCHRAN; MARK W.
GIBBS, PH.D.; TERESA D.
FERGUSON; JONATHAN J.
KEISLER, PH.D.; ANGELIA A.
TURNER; and CLEVON A. BOYD,
in his individual capacity,
                    Defendants.

---

DEPOSITION OF TERESA DENISE FERGUSON

---


DATE TAKEN:    February 3, 2020

TIME BEGAN:    1:00 p.m.

TIME ENDED:    3:20 p.m.

LOCATION:      Holcombe Bomar, P.A.
               101 West St. John Street
               Suite 200
               Spartanburg, South Carolina




REPORTED BY:   Eileen Thompson, CCR
               EveryWord, Inc.
               P.O. Box 1459
               Columbia, South Carolina 29202
               803-212-0012

Teresa Denise Ferguson

```
 1        A.    Yes, sir.

 2        Q.    Okay.  I understand that you have been a

 3   certified law enforcement officer, is that right?

 4        A.    Yes.

 5        Q.    When did you attend the Police Academy?

 6        A.    I graduated May 5th, 1995.

 7        Q.    Are you currently a class I officer?

 8        A.    Yes.

 9        Q.    Have you been a class I officer

10   continuously since 1995?

11        A.    Yes.

12        Q.    Have you ever been certified in any other

13   state?

14        A.    No, sir.

15        Q.    Have you ever served in the military?

16        A.    No, sir.

17        Q.    What is your current employment?

18        A.    I'm still at Spartanburg Methodist

19   College.

20        Q.    How long have you been employed at SMC?

21        A.    Since August 2006.

22        Q.    And what is your current position?

23        A.    Vice president of student development and

24   dean of students.

25        Q.    How long have you had the vice president
```

1    position?

2         A.    Since July of 2019.

3         Q.    And how long have you been the dean of

4    students?

5         A.    Since March of 2017.

6         Q.    Now, what did you do before the dean of

7    students position?

8         A.    I was the chief of campus safety.

9         Q.    Is that the job you were hired for?

10        A.    Yes, sir.

11        Q.    Who hired you to be the chief of campus

12   safety?

13        A.    Dr. Anita Bowles.

14        Q.    Is she still working at Spartanburg

15   Methodist?

16        A.    No, she retired.

17        Q.    When did she retire?

18        A.    December of 2018, I think.

19        Q.    Was the vice president of student

20   development position, is that a promotion for you?

21        A.    Yes.

22        Q.    Did you replace somebody in that position?

23        A.    Yes, retired.

24        Q.    Who was that?

25        A.    The previous -- so we had Ron Laffitte was

Teresa Denise Ferguson

1     A.    He was actually the director.  He had been

2  promoted to director.

3     Q.    Did he maintain the rank of lieutenant?

4     A.    No, when we made him director, that's

5  parallel to being a chief.  He was the director,

6  because he had a bachelor's degree and not a

7  master's.

8     Q.    Was Clevon Boyd the director, or was he

9  the chief?

10     A.    He was the chief.

11     Q.    You understand that Mr. Boyd had a

12  master's degree?

13     A.    He was working on his master's degree.

14     Q.    In this particular Exhibit 4, was there

15  anything reported in there about anything that Dr.

16  Summer Lashley was alleged to have done or said?

17     A.    No.

18     Q.    This report would have covered the year

19  period from 2016 to 2018, is that right?

20     A.    That's correct.

21     Q.    So nothing that Dr. Lashley was accused of

22  doing rose to the level of needing to be reported in

23  the annual crime report?

24     A.    That's correct.

25     Q.    I show you Exhibit 3 from Mr. Boyd's

1    and then two-year numerical space for actually the

2    day of the month, is that right?

3         A.    That's correct.

4         Q.    And then if there's multiple incidents on

5    the day, they would be consecutively numbered?

6         A.    That's correct.

7         Q.    To your knowledge, does this printout show

8    all of the reported incidents at SMC that occurred

9    in February of 2018?

10        A.    If a police report was done, yes.

11        Q.    And there was no reported incident for Dr.

12   Summer Lashley making alleged threats in February of

13   2018?

14        A.    That's correct.

15        Q.    When did you first meet Dr. Lashley?

16        A.    Right before school started, because we

17   went to meet the sheriff.

18             DR. LASHLEY:  Well --

19             MR. ROTHSTEIN:  You can't add anything.

20             DR. LASHLEY:  I was trying to help her.

21             MR. ROTHSTEIN:  If you want to get my

22   attention on something, you can tug on my sleeve.

23   EXAMINATION RESUMED BY MR. ROTHSTEIN:

24        Q.    All right.  So you recall going to meet

25   the sheriff of Spartanburg County?

1    Lashley's evaluations or student evaluations of any

2    of her classes?

3        A.    I didn't have access to that.

4        Q.    When you started, I guess, teaching --

5    took over one of her classes after she was

6    terminated, did the students mention Dr. Lashley or

7    ask questions about her?  Where she is, you know,

8    that kind of thing?

9        A.    Not in my class.

10       Q.    Do you recall Dr. Lashley having

11   involvement in reports of misconduct by some of the

12   student athletes while she was the director of the

13   criminal justice program?

14       A.    Repeat your question again.

15       Q.    Yes.  Do you recall her having any access

16   to -- any involvement in reporting complaints of

17   misconduct by any student athletes?

18       A.    What do you mean, "involvement"?

19       Q.    Was she sort of helping any of the

20   students make complaints or advocating for any of

21   the students?

22       A.    Yes, sir.

23       Q.    Okay.  And we kind of had an agreement

24   with Mr. Boyd's deposition that we would not use

25   student names but just use initials.  Can you recall

1  campus safety does?

2      A.   No, it can be campus safety, or any staff

3  member, or faculty.

4      Q.   I show you what we marked as Exhibit 11 to

5  Mr. Boyd's deposition.  Do you recognize that as an

6  excerpt from the Policy and Procedure Manual?

7      A.   Yes.

8      Q.   And the school discipline report that you

9  mentioned, is that set forth in this particular

10  policy under, "Workplace Violence Prevention," or is

11  that somewhere else?

12      A.   Are you talking about the crime report

13  itself?

14      Q.   No.  You mentioned a school discipline

15  report.

16      A.   The school -- that's in the student

17  handbook.

18      Q.   Okay.  Are you familiar with the workplace

19  violence prevention policy at SMC?

20      A.   Yes.

21      Q.   And is this the policy that was in effect

22  at the time of Ms. Lashley's employment with SMC?

23      A.   I'd say yes, because it says 2017-2018.

24      Q.   And on -- I've just sort of excerpted this

25  and showed the title page, the table of contents,

1    and then the actual workplace violence prevention

2    policy, which starts on page Roman numeral III-15

3    and goes through Roman numeral III-17.  Do you see

4    that?

5         A.   Yes, sir.

6         Q.   Okay.  And if you'll turn to page Roman

7    numeral III-16, sort of the paragraph before the

8    last set of bullets down there states that, "Anyone

9    who believes that he or she is a victim of a

10   threatening or violent conduct in the workplace, or

11   who observes such behavior or believes a credible

12   threat of such behavior exists should call campus

13   safety at 864-587-4003."  Do you see that?

14        A.   Yes, sir.

15        Q.   Is this policy and procedure communicated

16   to all staff and faculty at SMC?

17        A.   Yes.

18        Q.   To your knowledge, did anyone ever contact

19   campus safety about any type of threat or behavior

20   made by -- allegedly made by Summer Lashley?

21        A.   I don't know if -- Clevon would have been

22   the chief.  I don't know whether he was contacted or

23   not.

24        Q.   Who would have been responsible for doing

25   the chief's duties if he was on vacation?

Teresa Denise Ferguson

1        A.    Me.

2        Q.    Were you aware that Chief Boyd was on

3   vacation the week of the -- I guess it was the week

4   that Dr. Lashley was terminated?

5        A.    Yes.

6        Q.    Did anyone contact you about any type of

7   credible threat or threat of violent behavior with

8   regard to Dr. Lashley?

9        A.    I was contacted to meet with the

10  president.

11       Q.    All right.  I don't want to jump ahead too

12  much.  I will come back to those incidents in a

13  minute.  But in terms of the report, the school

14  discipline report that you received about the

15  cafeteria incident, would that have been -- that

16  would have been pursuant to a policy in the student

17  handbook?

18       A.    Yes.

19       Q.    Rather than this Policies and Procedures

20  Manual?

21       A.    This is for faculty and staff.

22       Q.    So there would be a similar complaint

23  mechanism for students to be notified?

24       A.    Yes, sir.

25       Q.    How to make a complaint if they felt like

1    they were threatened?

2        A.    Yes, sir.

3        Q.    Okay.  What did you do after you received

4    the school discipline report regarding the cafeteria

5    incident?

6        A.    I didn't have to do anything, it was taken

7    care of by our director of residence life and

8    student conduct.

9        Q.    And who was that?

10       A.    Trina Gilliam.

11       Q.    Did you ever discuss the incident with

12   Chief Boyd?

13       A.    I don't recall.  I could have at some

14   point, but he was the one that took care of it.

15       Q.    Do you know if the student involved was or

16   wanted to pursue criminal charges against the

17   basketball player?

18       A.    I think she did, but I can't recall

19   without looking at a document to see.

20       Q.    Did you or someone else at the school sort

21   of dissuade her from bringing criminal charges?

22            MR. FLIPPIN:  Object to the form.

23   EXAMINATION RESUMED BY MR. ROTHSTEIN:

24       Q.    He's putting an objection on the record.

25   But if you understand the question, you can answer

 1    you have any reason to dispute his statement?

 2         A.    No, I took him at his word, and after

 3    that, I left it alone.

 4         Q.    Did you ever bring that subject up with

 5    Dr. Lashley, about Bailey hanging out too much in

 6    the Walker building?

 7         A.    No.

 8         Q.    Had you spoken with Jenny Dunn -- first of

 9    all, what time of the year would you say this

10    conversation you had with Mr. Bailey was?

11         A.    I do not recall, sir.

12         Q.    Was it shortly before Dr. Lashley's

13    termination?

14         A.    I don't recall.  I don't recall what month

15    it was.

16         Q.    Okay.  Had you spoken with Jenny Dunn

17    about Dr. Lashley prior to that?

18         A.    No.

19         Q.    Did you ever speak with Ms. Dunn about Dr.

20    Lashley's history with a stalker?

21         A.    I wasn't aware of that.

22         Q.    Okay.  Do you recall an incident involving

23    a student at SMC who worked at the Walmart and had

24    some issue with a member of the basketball team

25    submitting some type of fraudulent gift cards?

Teresa Denise Ferguson

1    were not provided that information.

2        Q.    Let me show you Exhibit 10.   Do you

3    recognize Exhibit 10?

4        A.    I had not seen this until I -- I mean, I

5    hadn't remembered it until I -- until she gave it.

6        Q.    Okay.

7        A.    I hadn't seen this again, I should say.

8    Yes, I do recognize it.

9        Q.    All right.   Tell me how you first became

10   aware of any complaint or report of any type of

11   threatening activity or comments by Dr. Lashley.

12       A.    I found out about this on the day that Dr.

13   Lashley was asked to leave, about the comment.   I

14   was not aware of it.   And then the next week, which

15   was -- as you can see on this, it says February the

16   19th is when Dr. Turner -- Angelia Turner was asked

17   to give a written statement.

18       Q.    Tell me how you first -- you said you

19   first became aware of the statements on the day that

20   Dr. Lashley was terminated, which I believe was

21   Friday, February 16th of 2018?

22       A.    Yes, sir.

23       Q.    Okay.   How did you find out -- or tell me

24   what you learned on that day.

25       A.    I was told that Dr. Lashley had made a

Teresa Denise Ferguson

1    threat -- excuse me.  That Dr. Lashley had made a

2    threat.

3         Q.    Who told you that?

4         A.    President Cochran.  I was in President

5    Cochran's office.

6         Q.    Okay.  Were you in there specifically for

7    the discussion about Dr. Lashley?

8         A.    No, I was in there, because he was going

9    to let her go, and he wanted me to go with him.

10        Q.    Okay.  Did he indicate where he learned

11   that Dr. Lashley had made a threat?

12        A.    No, I was not privy to the prior

13   conversations.

14        Q.    And what did he tell you was the nature of

15   the threat that Dr. Lashley had made?

16        A.    That she had threatened to blow up the

17   school.

18        Q.    Do you know who reported that to -- or who

19   overheard Dr. Lashley make that comment?

20        A.    I found out that it was said to Angelia or

21   in the presence, I'm not sure which one it was.

22        Q.    Okay.  How soon before Dr. Lashley was

23   escorted off the campus did you learn about this

24   threat from Dr. Lashley?

25        A.    Just that morning, it was maybe 9:00.

1    Q.    Do you know when Mr. Cochran learned about
2    the alleged threat?
3    A.    I don't know.
4    Q.    Do you know when the alleged threat
5    actually happened?
6    A.    I do not know.
7    Q.    Okay.  So you were asked by Mr. Cochran to
8    escort him -- or accompany him to inform Dr. Lashley
9    that she was being removed from campus?
10    A.    Yes, sir.
11    Q.    Do you know why he asked you to come
12    along?
13    A.    Because Chief Boyd was on vacation.
14    Q.    Did you have any discussions with the
15    president about placing her on some type of like an
16    administrative leave or some sort of administrative
17    suspension pending an investigation?
18    A.    None of that was told to me.
19    Q.    Were you wearing a -- I mean were you
20    carrying a firearm at that time?
21    A.    That day, I was not.
22    Q.    Tell me what you can recall -- I mean, I
23    assume you went with Mr. Cochran to Dr. Lashley's
24    office?
25    A.    Yes.

1    words that were exchanged from both parties.

2         Q.    Did you observe Dr. Lashley's demeanor

3    once President Cochran said today was her last day?

4         A.    Surprised, but I mean, anybody would be.

5         Q.    Did Dr. Lashley say anything or do

6    anything that caused you to fear for your safety

7    during that meeting?

8         A.    No.

9         Q.    Did you frisk Dr. Lashley to see if she

10   had any weapons on her?

11        A.    No.

12        Q.    You made a funny face about that.  Why did

13   you make a face when I asked you that question?    I

14   mean, does it seem preposterous that Dr. Lashley

15   would carry a weapon in the school?

16        A.    No.

17        Q.    Did Dr. Lashley -- I guess, as you walked

18   her off campus, did she -- was she like resistant to

19   leaving?

20        A.    No, she was not.

21        Q.    Did you help Dr. Lashley pack her things

22   up?

23        A.    I carried some down, she carried

24   everything else, and we walked to the car.

25        Q.    Did anybody else help you carry stuff

1    down?

2        A.    No, because there was nobody else in

3    there.

4        Q.    Do you know where the students went when

5    President Cochran asked them to leave?

6        A.    They went out, but I don't know where they

7    went.  I don't know where they went.

8        Q.    Was that a school day?

9        A.    Yes.

10        Q.    Okay.  Did Dr. Lashley have classes

11    scheduled for that afternoon?

12        A.    More than likely.

13        Q.    Do you know if anyone covered those

14    classes?

15        A.    If I recall the time of day it was, her

16    classes were done.  I don't know her schedule, so I

17    don't know if she had any more, but it appeared to

18    be at the end of the day, because that's a Friday.

19        Q.    Was this after lunch?

20        A.    Yes.

21        Q.    Okay.  How long was it between the time --

22    I thought you indicated that Mr. Cochran had called

23    you in sort of early in the morning, like around

24    9:00 in the morning?

25        A.    Yes.

Teresa Denise Ferguson

1       Q.    And so you just waited until after lunch?

2       A.    He hadn't decided what time.

3       Q.    Okay.  So was there -- I thought Mr.

4  Cochran called you?

5       A.    The meeting was at 9:00.  We met at 9:00.

6       Q.    So did he call you back to meet with him

7  to go along?

8       A.    If I recall, he told me what time, because

9  I don't recall that it was right then.  It was not

10  right then.

11      Q.    Okay.  And so let's get back to Exhibit

12  10.  How did it come about that you took a statement

13  from Angelia Turner on the following Monday,

14  February 19th, about 12:00?

15      A.    I don't think that the chief was back yet,

16  and we needed to document the statement.  So I keep

17  these forms in my office, and I took her this form.

18      Q.    Who asked you to see if somebody would

19  write or give a statement?

20      A.    Well, we needed to document this.  We just

21  wanted to document it.

22      Q.    How did you know to go to Angelia Turner?

23      A.    I was told -- well, they were office

24  mates, and that she was the one who overheard the

25  statement.

Teresa Denise Ferguson

```
1         Q.    And that's what President Cochran relayed
2    to you?
3         A.    Yes.
4         Q.    And he told you that on Friday?
5         A.    Yes.
6         Q.    Was Ms. Turner at school on Friday, do you
7    remember?
8         A.    I don't recall if she was or not.
9         Q.    And is this Angelia's handwriting?
10        A.    Yes, it is.
11        Q.    Did you actually -- I mean, tell me what
12   you can recall about your interactions with Ms.
13   Turner about this statement.  You just went into her
14   office and said, "Can you just write something up
15   for me"?
16        A.    Yes, and then she wrote the statement, and
17   then I signed it.
18        Q.    Did you read the statement that she wrote?
19        A.    I did.
20        Q.    Did you ask her any follow-up questions?
21        A.    No.
22        Q.    Did you do like an interview of her, or
23   did you just say, "Can you write a statement about
24   what you heard"?
25        A.    I asked her what she heard and to write a
```

Teresa Denise Ferguson

```
1   statement.
2        Q.    Okay.  Did you ever interview the work
3   study student as part of your sort of gathering of
4   statements?
5        A.    No.
6        Q.    Would you describe this statement
7   gathering as an investigation, or were you just
8   trying to document something for the file?
9        A.    It was the documentation.
10       Q.    Okay.  So the decision had already been
11  made at that point, right?
12       A.    Yes.
13       Q.    Do you see at the beginning there it says,
14  "Per my conversation with Dr. Mark Gibbs on February
15  15th, 2018"?
16       A.    Yes, sir.
17       Q.    Did you ever have any discussions with Dr.
18  Gibbs about this matter?
19       A.    I did not.  Now, Dr. Gibbs was in a
20  meeting with Dr. Cochran and I.  It was the three of
21  us.
22       Q.    The meeting at 9:00?
23       A.    Yes.
24       Q.    Did Dr. Gibbs say anything about the
25  decision to terminate Dr. Lashley?
```

Teresa Denise Ferguson

```
1        A.    They might have had a conversation before
2   I came in, I don't know.
3        Q.    But in your presence, did Dr. Gibbs say
4   anything?
5        A.    No.
6        Q.    So as you understand it, Ms. Turner
7   overheard something on February 14th about Dr.
8   Lashley was having some conversation with some
9   students?
10       A.    Uh-huh.
11       Q.    Ms. Turner overheard Dr. Lashley saying
12  something about blowing the school up, right?  And
13  apparently Ms. Turner relayed that to Dr. Gibbs the
14  following day?
15       A.    I don't know about the timeline, sir.
16       Q.    Do you know what the course area of study
17  Ms. Turner teaches is?
18       A.    She's the online criminal justice
19  director.
20       Q.    Do you know why Ms. Turner went to Mark
21  Gibbs instead of calling campus safety about the
22  matter?
23       A.    That's her -- she reported it to her
24  supervisor.
25       Q.    Okay.  Do you know what time of the day
```

```
 1        Q.    Okay.  So you kept it until the chief got
 2   back?
 3        A.    Uh-huh.
 4        Q.    What was the purpose of giving the
 5   statements to the chief?
 6        A.    He's the chief.
 7        Q.    Do you know if the chief did any type of
 8   investigation?
 9        A.    No, he didn't.  No.
10        Q.    I show you Exhibit 12.  Do you recognize
11   Exhibit 12?
12        A.    Yes, sir.
13        Q.    Okay.  And is that the same kind of
14   statement you got from Dr. Keisler?
15        A.    Yes, sir.
16        Q.    How did you know to contact Dr. Keisler?
17        A.    I was told that he was involved in this.
18        Q.    Who told you that?
19        A.    It was Dr. Cochran.  It was that morning,
20   that morning meeting.
21        Q.    You said that Keisler knew something about
22   --
23        A.    Yes.
24        Q.    -- the matter with Dr. Lashley?
25        A.    Yes.
```

1    Q.    It looks like this statement was dated the

2    same day, Monday, February 19th --

3    A.    Yes, sir.

4    Q.    -- 2018 at 2:30 p.m.  How long did you

5    spend with Ms. Turner getting her statement?

6    A.    Maybe 30 minutes.

7    Q.    Okay.  Did you go to lunch after that or

8    something?

9    A.    I'm not sure he -- I'm not sure.

10    Q.    Was Keisler teaching a class or something?

11    A.    He was teaching.

12    Q.    So tell me what you can recall about your

13    conversation with Keisler.

14    A.    I just asked him to write this statement.

15    I did not know what he knew.

16    Q.    Did you read the statement that Dr.

17    Keisler wrote?

18    A.    I did.

19    Q.    Did you ask him any kind of follow-up

20    questions about it?

21    A.    I did not.

22    Q.    Do you know if either Ms. Turner or Mr.

23    Keisler ever reported these alleged threats to law

24    enforcement?

25    A.    Not outside of the campus, no, I'm not

1    aware.

2        Q.    What about within the campus?  Do you know

3    if they ever reported the threats to law enforcement

4    within the campus?

5        A.    No, because the chief was out of town.

6    So, no, it was not reported to any other officers.

7        Q.    Weren't there other officers in the campus

8    safety department at that time?

9        A.    Yes.

10        Q.    If somebody felt they were a victim of a

11    crime and the chief was out of town, would there be

12    someone at SMC campus safety to report that to?

13        A.    Yes.

14        Q.    And the phone number that's in the faculty

15    or staff handbook, that I think we looked at it a

16    little while ago, that if you felt you observed a

17    threat or some sort of crime, that you were to call

18    this number?

19        A.    Yes.

20        Q.    Does that number get answered when the

21    chief is out of town?

22        A.    That's the main number for the police

23    department, yes, sir.  It always gets answered.

24        Q.    But to your knowledge, neither Ms. Turner,

25    nor Dr. Keisler ever called that phone number to

Teresa Denise Ferguson

1    make an incident report, did they?

2         A.    Not that I'm aware of, sir.

3         Q.    Do you know whether Mr. Keisler brought

4    this conversation to the attention of either Dr.

5    Gibbs or the president?

6         A.    I don't know.

7         Q.    Did you get any other statements from any

8    other potential witnesses to this matter?

9         A.    No, sir.

10        Q.    Who told you just to get statements from

11   Keisler and Turner?

12        A.    I was told that these were the two faculty

13   members who had overheard something.

14        Q.    Do you know why you didn't get statements

15   from any of the students that might have overheard

16   something?

17        A.    No, I wasn't -- I wasn't asked to get any

18   statements.

19        Q.    And it was President Cochran who told you

20   who the two people were to get statements from?

21        A.    Yes.

22   (Whereupon, the court reporter marked Ferguson

23   Exhibit Number 14 for identification.)

24   EXAMINATION RESUMED BY MR. ROTHSTEIN:

25        Q.    I show you Exhibit 14.  Do you recognize

1    Exhibit 14?

2        A.    I don't, sir.

3        Q.    You've never seen that document before?

4        A.    No, sir.

5        Q.    No one asked you to get a statement from

6    Mark Gibbs?

7        A.    No, sir.

8        Q.    To your knowledge, who made the decision

9    to terminate Dr. Lashley?

10       A.    I don't know who made that decision.

11       Q.    The person that communicated that to you

12   was Mr. Cochran?

13       A.    Yes, sir.

14       Q.    Did he say, "I made the decision to

15   terminate Dr. Lashley," or "we made the decision"?

16   Do you recall what he said?

17       A.    I don't recall what he said.

18       Q.    Did anybody ask your opinions about

19   whether to terminate Dr. Lashley?

20       A.    No.

21       Q.    I show you what we marked as Exhibit 6

22   during Mr. Boyd's deposition.  Have you ever seen

23   Exhibit 6 before?

24       A.    Only when the lawsuit was filed and this

25   was provided did I know.  I did not know ahead of

Teresa Denise Ferguson

```
 1   time.
 2        Q.    Do you know whose phone this came off of?
 3        A.    I do not.
 4        Q.    Do you know anyone in residence life or
 5   sort of under your umbrella of dean of students that
 6   had the initials C.W.?
 7        A.    I don't know who it is.
 8        Q.    Okay.  The first time you recall seeing
 9   this was after the lawsuit was filed?
10        A.    Yes.
11        Q.    So you had nothing to do with the decision
12   to send this text message or communication out to
13   the school?
14        A.    No, sir.
15        Q.    Have you since found out who was
16   responsible for sending out this communication?
17        A.    Yes.
18        Q.    Okay.  How did you find that out?
19        A.    I found out just through going through the
20   lawsuit information when that was requested.
21        Q.    Okay.  Who do you understand to have sent
22   this document?
23        A.    Trina Gilliam.
24        Q.    And what is Ms. Gilliam's position?
25        A.    She's the director of residence life and
```

1    student conduct.

2        Q.   Do you see the date on -- or I'm sorry.

3    The time on this text message is 1:39?

4        A.   Uh-huh.

5        Q.   Do you know when this particular text

6    message was sent out?

7        A.   I don't know what date, no.

8        Q.   Okay.  Do you know who made the actual

9    screenshot of this text message?

10       A.   I have no idea.

11       Q.   How did you find out that Trina Gilliam

12   was the one that sent this out?

13       A.   I found out -- are you saying how I found

14   out?

15       Q.   Yes.

16       A.   Just in conversation of trying to

17   determine where it came from.

18       Q.   And did Ms. Gilliam admit that she sent it

19   out or ordered that it be sent out?

20       A.   Yes.

21       Q.   Do you know if Ms. Gilliam sent out other

22   communications with Dr. Lashley's picture on it?

23       A.   I'm not aware.

24       Q.   Did Ms. Gilliam indicate to you who told

25   her that Dr. Lashley -- or who told her that Dr.

1  Lashley might be volatile and unstable?

2      A.   Say that question again.

3      Q.   Yes.  Did Ms. Gilliam indicate to you who

4  told her that Dr. Lashley might be volatile and

5  unstable?

6      A.   No.

7      Q.   Do you know who told Ms. Gilliam to warn

8  people not to approach Dr. Lashley?

9      A.   I'm the one who told her to notify -- no,

10 I told her, and she made the decision to notify the

11 residents of it.  That's who that is.

12     Q.   What specifically did you tell her?

13     A.   I just told her that Dr. Lashley was no

14 longer there, and then she relayed information to

15 the residents.

16     Q.   How would she have gotten information that

17 there was some, you know, concern in connection with

18 Dr. Lashley's determination?

19     A.   I just told her she was no longer there.

20     Q.   Okay.  Do you know if Ms. Gilliam talked

21 to anybody else about Dr. Lashley's leaving?

22     A.   I don't know.

23     Q.   Okay.  Ms. Gilliam was your direct report,

24 right?

25     A.   Yes, sir.

1      Q.    Do you know where Ms. Gilliam got the

2   photograph?

3      A.    I have no idea.

4      Q.    Did you think it was appropriate for Ms.

5   Gilliam to send that communication out with Dr.

6   Lashley's picture on it?

7            MR. FLIPPIN:   Object to the form.

8            THE WITNESS:   I didn't know she sent it.

9   EXAMINATION RESUMED BY MR. ROTHSTEIN:

10     Q.    I mean, now that you know, do you think it

11  was appropriate for her to send it?

12     A.    No.

13     Q.    Okay.   If Ms. Gilliam had said to you,

14  "Ms. Ferguson, I'm thinking about sending out this

15  picture," would you have said, "Don't send it," or

16  would you have given her permission to send it?

17           MR. FLIPPIN:   Object to the form.

18           THE WITNESS:   I don't know where the

19       picture came from, so...

20  EXAMINATION RESUMED BY MR. ROTHSTEIN:

21     Q.    I'm talking about this whole

22  communication.   Do you understand the picture and

23  the text message were sent at the same time?

24     A.    It appears so.

25     Q.    Okay.   And if Ms. Gilliam had said to you,

1    when Mr. Cochran asked you to walk Dr. Lashley off

2    of campus, did Dr. Lashley appear to be volatile and

3    unstable to you?

4         A.    I just walked her.  I did not -- I mean, I

5    don't use those words.

6         Q.    In your walking her out, did you observe

7    anything that caused you to be concerned about

8    whether she was a harm to anybody else at that time?

9         A.    No, sir.

10        Q.    Have you ever observed anything about Dr.

11   Lashley that indicated she would be a threat to

12   somebody?

13        A.    No, sir.

14        Q.    How many different residence hall

15   directors are there at Spartanburg Methodist -- or

16   were there at the time?

17        A.    There's seven.  There's one in each

18   building.

19        Q.    Is that the same thing as an RA, a

20   residence hall?

21        A.    No, RA is a student.  RHD is an adult.

22        Q.    So RHD is an employee of Spartanburg

23   Methodist College?

24        A.    Yes, sir.

25        Q.    How many RAs are there in each building?

1      A.    There's 22 total.

2      Q.    Is that like one on each floor or

3  something like that?

4      A.    Yes, sir.

5      Q.    Do you know if this information with Dr.

6  Lashley's picture and some sort of text message

7  about her termination was sent to any of the

8  students?

9      A.    I'm not aware of that.

10     Q.    Okay.  Do the RHDs actually live in the

11  dorms?

12     A.    Yes, sir.

13     Q.    Do you know an RHD with the initials C.W.

14  at that time?

15     A.    I cannot remember who that is, sir.

16     Q.    Is there some type of roster or list of

17  the RHDs at a particular moment in time?

18     A.    Yes, but when we have a change from -- we

19  do have a change in that position every few years,

20  so it is usually printed in the student handbook.

21     Q.    Do you know if -- have you seen any other

22  communications similar to Exhibit 6 that were sent

23  out after Dr. Lashley's termination?

24     A.    I'm not aware of any.

25     Q.    At some point, were you asked to contact

1    the solicitor's office or the sheriff's office about

2    whether to bring some type of criminal charges

3    against Dr. Lashley?

4         A.    I called the solicitor's office.

5         Q.    Did somebody ask you to do that?

6         A.    No, I just thought I would call.

7         Q.    When did you call the solicitor's office?

8         A.    I don't recall the date.

9         Q.    Was it the week after Dr. Lashley was

10   terminated?

11        A.    It was early the next week, some time that

12   next week.

13        Q.    So like maybe the week of the 26th?

14        A.    I can't recall.

15        Q.    Was it the week after you got this

16   statement, so the week after Dr. Lashley was

17   terminated?

18        A.    It was after the statement.

19        Q.    Okay.

20        A.    I think, I don't recall.

21        Q.    So the statements were on Monday, the

22   19th?

23        A.    That's correct.

24        Q.    Would it have been during that week or the

25   following week, like starting the week of the 27th

1    or 26th?

2        A.    I'm not sure.

3        Q.    You don't recall?

4        A.    I don't recall the exact date.

5        Q.    Let me show you Exhibit 5.  Were you aware

6    that Chief Boyd sent a trespass notice to Dr.

7    Lashley on or about February 22nd, 2018?

8        A.    Yes, sir.

9        Q.    Okay.  How did you first become aware of

10   that?

11       A.    He asked -- he was told to place her on

12   trespass notice.  And he asked me what information

13   he needed provided, and he actually sent this to me

14   to proof before he sent it out.

15       Q.    You said Boyd was told to place her on

16   trespass notice.  Who told him to place her on a

17   trespass notice?

18           MR. FLIPPIN:   Object to form.

19   EXAMINATION RESUMED BY MR. ROTHSTEIN:

20       Q.    Was that something you told him to do?

21       A.    I don't recall who told him to put her on

22   trespass notice.

23       Q.    Are you aware of any other employee at SMC

24   who has been terminated and was placed or received a

25   similar type of trespass notice?

Teresa Denise Ferguson

```
 1         A.    Yes, we have had other employees.
 2         Q.    How many times has that occurred since you
 3   have been involved at SMC, would you say?
 4         A.    I would say probably maybe a handful of
 5   times.  It has not been many.
 6         Q.    Okay.  Is that a routine occurrence, to
 7   send a trespass notice of someone who is terminated
 8   at SMC?
 9         A.    It depends on the circumstances.
10         Q.    What circumstances would have warranted a
11   trespass notice to Dr. Lashley?
12         A.    I'm sorry.  Repeat the question, sir.
13         Q.    What circumstances would have warranted a
14   trespass notice?
15         A.    Well, this was based on what she
16   communicated.
17         Q.    Okay.  Did you ever talk to the sheriff
18   about Dr. Lashley's termination?
19         A.    No, I didn't talk to him.  No, sir.
20         Q.    When you called the solicitor's office,
21   what did you ask them?
22         A.    I told them what she said, and that she
23   had been already relieved of her duties.  And they
24   -- and we had -- I think we had, at that point,
25   statements.  And they said based on what she said,
```

1    A.    Yes, sir.

2    Q.    What did you do to make sure that no

3  communications were deleted or destroyed that might

4  concern Dr. Lashley?

5    A.    I didn't do anything, I just left my

6  computer as is.

7    Q.    Okay.  Did you ever communicate with

8  anyone via text message about Dr. Lashley?

9    A.    No.

10   Q.    Do you regularly use text messages?

11   A.    Not a lot.

12   Q.    Do you have a phone, like an official work

13 phone that's assigned by the school?

14   A.    Yes.

15   Q.    Has that phone changed at all in the last

16 --

17   A.    No.

18   Q.    -- five years or so?

19   A.    No, I've had the same number for 13 years.

20   Q.    What e-mail program do you use at work, do

21 you know?  Is it like Microsoft Outlook?

22   A.    Yes, it's Outlook.  Yes, sir.

23   Q.    Now, what's your regular sort of practice

24 with regard to your inbox?  Do you -- I mean, I'm

25 kind of ashamed to say it, but I still have things

Teresa Denise Ferguson

```
 1   from my inbox from the first time I turned that
 2   computer on.  Do you ever delete things off your
 3   computer?
 4        A.   I do, but not everything.
 5        Q.   Is there a regular archive system at the
 6   school to back things up or clear out inboxes, do
 7   you know?
 8        A.   You have to clean your inbox out
 9   sometimes, because it will get full.
10        Q.   What do you do to clean out your inbox?
11        A.   Go back through and refile and delete
12   them.
13        Q.   Since you received this Litigation Hold
14   Notice, have you deleted anything regarding Dr.
15   Lashley?
16        A.   I have not.
17   (Whereupon, the court reporter marked Ferguson
18   Exhibit Number 19 for identification.)
19   EXAMINATION RESUMED BY MR. ROTHSTEIN:
20        Q.   Do you recognize Exhibit 19?
21        A.   Yes.
22        Q.   And these are the Answers to
23   Interrogatories and Requests For Production.  Did
24   you review these at some point?
25        A.   Yes, sir.
```