IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| SUMMER D. LASHLEY, PH.D., | C.A. No. 7:18-cv-02957-JD-KFM |
| PLAINTIFF, | |
| v. | |
| SPARTANBURG METHODIST COLLEGE; W. SCOTT COCHRAN; MARK W. GIBBS, PH.D., TERESA D. FERGUSON; JONATHAN J. KEISLER, PH.D., ANGELIA A. TURNER; AND CLEVON A. BOYD, IN HIS INDIVIDUAL CAPACITY, | REPLY TO PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| DEFENDANTS. | |

Defendants submit this reply to Plaintiff's objections to Judge Kevin F. McDonald's Report and Recommendations to Defendants' Motion for Summary Judgment. Defendants incorporate their memorandum in support of motion for summary judgment and their reply to Plaintiff's response in opposition to that motion. This reply is addressed to the corresponding numbered arguments presented in Plaintiff's objections.

On Friday, February 16, 2018, Spartanburg Methodist College's ("SMC") President, Scott Cochran, fired Dr. Summer Lashley when he was informed of threatening statements she made in the presence of two, separate faculty members. Just two days earlier, on February 14th, the nation learned of the horrific massacre of 17 innocent lives at the Stoneman Douglas High School in Parkland, Florida. Even today, we are reminded of the tragic reality facing college leaders: "Two officers shot and killed at Bridgewater

College in Virginia."[1] Article dated February 1, 2022, Exhibit A, at pg. 1. No doubt, the leaders of that small college are, at this very moment, examining if they could have done anything to prevent this shocking loss. On the opposite side of the country, we read that the chancellor of the University of California - Los Angeles canceled classes for nearly 50,000 students because of a threatening email from a former lecturer.[2] *Id.*, at pgs. 2-3. This drastic action was taken "out of an abundance of caution" even though the suspect was arrested more than a thousand miles away. Did Bridgewater College's leadership do enough? Did UCLA overreact to a perceived threat of violence? Resolution of Plaintiff's claims against SMC requires the wisdom to refrain from the risk of hindsight analysis without due consideration of the uncertainties posed by Dr. Lashley's conduct.

Plaintiff's objections do not raise issue with the Magistrate Judge's recommendations that Plaintiff's claims under Title VII (hostile workplace, disparate treatment, and gender discrimination), Title VII retaliation, Title IX discrimination, 42 U.S.C. § 1983, South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10, *et seq.*, and breach of contract accompanied by fraudulent act be dismissed from this action. Dr. Lashley also failed to object to the recommendation that the District Court grant Defendants' motion as to her defamation claims with the exception of her claims arising from a) a text message to Resident Assistants and Residence Hall Directors, b) Turner's report that Plaintiff stated that she felt like "blowing the place up," and c) Dr. Keisler

---

[1] *See* https://www.cnn.com/2022/02/01/us/bridgewater-college-active-shooter-reports/index.html, last accessed February 1, 2022.
[2] *See* https://ktla.com/news/local-news/ucla-cancels-in-person-classes-following-apparent-mass-shooting-threat-by-former-lecturer/, last accessed February 1, 2022.

reported that shortly before her termination, Plaintiff stated to him that "people who cross me wind up dead." ECF No. 1, at ¶¶ 63, 66(A), & 66(B).

Finally, Plaintiff did not object to the recommendation to dismiss her invasion of privacy claims with the sole exception of Defendants' dissemination of Dr. Lashley's "LinkedIn" photo via text message. ECF No. 1, at ¶ 155 (F). Accordingly, the District Court may (and should) adopt Magistrate Judge McDonald's Report and Recommendation and grant Defendants' motion for summary judgment as to these claims without further consideration.

Preliminarily, Plaintiff quotes *United States v. Diebold, Inc.*, for the well-established proposition that "inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." 369 U.S. 654, 655 (1962). What Dr. Lashley fails to provide are specific factual conclusions reached by the Magistrate Judge regarding which an inference could be made in her favor.

**1.     Plaintiff's Motion for Sanctions and Rule to Show Cause Should Not Delay the Court's Adoption of the Magistrate Judge's Report and Recommendation.**

Dr. Lashley relies on rank speculation to argue that she does not have the discovery necessary to proof her claims for defamation and invasion of privacy relating to text messages sent to SMC staff members after Dr. Lashley's termination. However, Plaintiff waived any complaints of the adequacy of SMC's discovery responses when she decided not to challenge Defendants' responses through a timely motion to compel before the discovery deadline under the Magistrate Judge's nine amended scheduling orders.

3

A few observations provide context for Plaintiff's efforts at distraction. First, she argues that Defendants forced Plaintiff to disclose her text messages. In fact, Plaintiff voluntarily supplied her iPhone to her attorney for their own expert to extract more than 18,000 text messages from her phone. During her deposition, she emphatically invited Defendants to search her computer. ECF No. 116, at 184:3-185:11. Second, Plaintiff confusingly argues that Gibbs didn't provide text messages, but proceeds to quote him as stating that a forensic technician "came to campus and kept my phone for several hours went through it, I suppose, with a fine-tooth comb." ECF No. 214, at pg. 12. Plaintiff neglects to mention that in response to her first requests for production, Defendants produced several pages of text messages between Plaintiff and Defendant Turner. In the interest of fairness, Defendants later subjected numerous Defendants' and employees' cellphones to forensic review using keywords designed to find communications to or about Plaintiff. This effort produced only a handful of messages.[3]

What is perhaps more troubling is that she represents to this Court that her motion for sanctions, which was filed on the dispositive motion deadline, should halt the proceedings so that Dr. Lashley can seek records *that have already been produced.* Instead, argument is not properly before the Court and should not compromise its analysis of the Magistrate Judge's Report and Recommendation.

---

[3]  Plaintiff doubts the sufficiency of this production. However, she may not have contemplated the reality that she was not the subject of text message communications by Defendants and SMC employees after her termination.

4

**2.     Plaintiff Cannot Demonstrate That She Was a Qualified Individual with a Disability Under the Americans with Disabilities Act ("ADA").**

In response to Defendants' motion for summary judgment, Plaintiff argued that at the time SMC declined to offer her a new contract and when she was terminated "she was suffering from a serious, unknown illness that caused her to have uncontrollable diarrhea." ECF No. 242, at pg. 21. She further argued that PTSD, Lupus, and asthma amounted to disabilities under the ADA. *Id*. Although Dr. Lashley faults the Magistrate Judge for finding that only her GI issues and asthma were disabilities entitled to protection, she fails to address the substance of the Report's findings that she "presented no evidence supporting her claim that these impairments substantially limit one or more of her major life activities." ECF No. 254, at pg. 18. If these additional ailments "easily met the definition" of a disability under the ADA, Plaintiff should be able to cite evidence in the record correcting the Magistrate Judge's error. However, she does not and cannot.

**3.     The Magistrate Judge Correctly Found that SMC Met its Obligation under the ADA to Accommodate Plaintiff's Complaints of Mold in the Walker Building.**

There is no dispute of material facts regarding whether Plaintiff requested a reasonable accommodation. As to the issue of alleged[4] mold in the Walker Building, Plaintiff has offered no evidence that mold exacerbated her asthma. In response, SMC immediately offered to move her office, but Dr. Lashley declined. As to her GI issues, it is undisputed that Dr. Lashley received SMC's reasonable accommodation form within an hour of requesting the form from human resources director Jenny Dunn. However, Dr.

---

[4]     There is simply no evidence of mold in the Walker Building. Plaintiff complained to SMC's facilities staff of stains in ceiling tiles. SMC's staff investigated the issue, replaced tiles that had water stains from a condenser, and offered to move Plaintiff to an alternative office.

Lashley never completed the one-page form nor engaged in the interactive process to assess her need for a reasonable accommodation.

### 4. & 5. Dr. Lashley Failed to Engage in the Interactive Process Prescribed by the ADA to Accommodate Her Alleged Need to Move Her Office Closer to the Bathrooms.

Plaintiff disingenuously argues that the accommodation form's language that "additional medical certification may be requested" contributed to her failure to complete the form. Dr. Lashley testified that she simply did not look at the form. ECF No. 116, at 178:9-17. Even if we she had read the form, which she received on February 5th, she offers no excuse for failing to have her gastroenterologist complete the form at her February 6, 2018, office visit. LashleyMed000018. Dr. Lashley was certainly entitled to ask that her specialist assist her in completing the form. SMC's staff cannot be blamed for Dr. Lashley's failure to read[5] or submit the form.

### 6. Dr. Lashley Fails to Identify Discriminatory Animus Arising from Plaintiff's Alleged Disabilities

In opposition to the Magistrate Judge's recommendation Plaintiff argues only that uncontrollable diarrhea "might" effect Plaintiff's ability to teach class or that such a condition "might" require a "quick break" from class. ECF No. 266, at pg. 4. The Magistrate Judge appropriately analyzed the evidence in the record, which provides no evidence of the accommodations Dr. Lashley "might" have sought had she completed SMC's reasonable accommodations paperwork. Instead, the Report correctly finds "no evidence showing that she requested the accommodation of moving her office closer to a bathroom in the Walker Building." ECF No. 254, at pg. 21.

---

[5] Moreover, it would be patently unreasonable to conclude that a college professor with a Ph.D. and two master's degrees could not comprehend the one-page form.

Even if, as she alleges, Plaintiff informed Jenny Dunn by telephone that she needed to move to an office closer to a restroom, this would not alter the correct analysis. Jenny Dunn could reasonably rely on Dr. Lashley's accommodation paperwork to satisfy SMC's duties under the ADA. The evidence before the Court is that SMC offered to move Plaintiff to a different office shortly after learning (through its facilities staff) that Plaintiff was unhappy with the Walker Building. Plaintiff's argument that she did not get an accommodation relies on unreasonable inferences and speculation. To wit, did the ADA obligate Jenny Dunn to email Plaintiff daily about the status of her reported GI issues? This is unreasonable as the ADA's interactive process is a negotiation between the employer and the employee.

The evidence before the Court is that SMC met its burden to engage with Dr. Lashley in the interactive process. When informed that Plaintiff reported that conditions in the Walker Building affected her health, Dr. Gibbs met with Plaintiff to see what could be done. When Plaintiff asked Jenny Dunn for reasonable accommodation paperwork, Mrs. Dunn sent the form within the hour. ECF No. 212-2, at ¶ 17.

Plaintiff criticizes the Report for characterizing as ADA retaliation SMC's decision not to offer a contract for a second year and to terminate her employment. Against this, Plaintiff offers only the temporal proximity of Dr. Lashley's health disclosures to Dr. Gibbs. The Magistrate Judge's conclusion was based on the absence of evidence that SMC or its employees acted with discriminatory animus due to Plaintiff's underlying medical conditions. ECF No. 254, at 23. Plaintiff alleges that Dr. Gibbs' offer to allow her to move her office to the Ellis Building demonstrates retaliation in violation of the ADA. Yet she

7

cannot dispute the clear record evidence that this move was suggested by Marty Wood, SMC's maintenance director. ECF No. 212-4, at pg. 12.

**7.    Dr. Lashley Cannot Demonstrate that Scott Cochran's Decision to Terminate Her Was Caused by Discriminatory Animus.**

Plaintiff simply fails to connect President Cochran's decision to terminate Plaintiff with her alleged ADA disabilities. There is no evidence Cochran was aware of her request for an accommodation form from Jenny Dunn in the weeks prior to her termination. ECF No. 212-5, at ¶ 11. Although President Cochran was aware of Plaintiff's complaints regarding alleged mold in the Walker Building, Plaintiff denies that her complaints amounted to a request for an ADA accommodation.

### a.    Post-Termination Procedures

Plaintiff misleadingly conflates President Cochran's testimony by arguing that he denied Plaintiff a grievance hearing, a Title IX investigation, or a whistle-blower hearing based on Plaintiff's counsel's letters announcing her intent to pursue legal action. ECF No. 243-4, at 177:15-19 & 180:8-19. His testimony is clearly limited to his decision (which he later reversed) to pay the balance of Dr. Lashley's salary and benefits.

In any case, Plaintiff cannot demonstrate that she had a right to the post-termination procedures she relies on here. Plaintiff, as an untenured faculty member, did not have a right to grievance procedures stemming from her termination. *See* ECF No. 212-2, at pg. 140. As to Plaintiff's claim that SMC breached its contract regarding her whistleblower claim, SMC's policy and procedure manual specifically disclaims any contractual obligations arising from this procedure. "This policy is not a contract … [i]t does not provide greater or lesser rights than applicable law provides." *Id.*, at pg. 83.

8

The record evidence does not support Plaintiff's claims regarding SMC's handling of her attorney's requests for grievance procedures or a whistleblower hearing. Despite the fact that SMC had no obligation to provide these proceedings, Plaintiff was offered a hearing before a neutral three-person panel. ECF No. 212-3, at pgs. 87-90. Plaintiff rejected these invitations.

Finally, Plaintiff cannot create an issue of fact on the basis of speculation. She has not offered competent evidence regarding SMC's internal deliberations after her termination. The allegations contained in Plaintiff's complaint about the lack of post-termination procedures are not based on Dr. Lashley's personal knowledge. See *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Accordingly, she cannot defeat summary judgment by citing to her verified complaint.

### b.     Promise to Pay Salary and Benefits for Balance of Term

Plaintiff has not, and cannot, demonstrate that President Cochran's promise to pay gives rise to a contract enforceable at law. Accordingly, his decision to withdraw payment for which Plaintiff had no lawful claim cannot be classified as an adverse employment action. Moreover, there is simply no evidence that Cochran's actions were based in discriminatory animus.

Plaintiff has not demonstrated that Cochran's unilateral promise to pay formed a contractual obligation to pay the balance of Plaintiff's salary. Cochran's promise was unenforceable because Dr. Lashley neither made a mutual promise, nor was required to perform any specific action. "A typical contract contains mutual promises and is created by an acceptance constituting a return promise by the offeree." *Electro-Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter*, 357 S.C. 363, 369, 593 S.E.2d 170, 173 (Ct. App. 2004)

9

(*citing* RESTATEMENT (SECOND) OF CONTRACTS § 50, cmt. c (1981)). In the absence of mutual promises, "[a] unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance." *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 405, 581 S.E.2d 161, 165–66 (2003) (citing *International Shoe Co. v. Herndon*, 135 S.C. 138, 133 S.E. 202 (1926)). However, President Cochran's promise to pay did not require any further action by Dr. Lashley. Therefore, his promise did not impose a legal duty on SMC. Plaintiff can identify no consideration for this alleged contract as required by hornbook contract law.

> A promise may constitute the consideration for another promise. But a promise is not a good consideration for a promise unless there is absolutely mutuality of the engagement, so that each party has the right to hold the other to a positive agreement. In case the promise of one of the parties impose no legal duty upon the party making it, such promise furnishes no consideration for a promise.

*Int'l Shoe Co.*, 135 S.C. 138, 133 S.E. at 203 (*quoting* Elliott on Contracts, vol. 1, § 231). Without consideration, there is no contract. Absent a legal obligation to pay Dr. Lashley, President Cochran's delay in paying the balance of her contract cannot form the basis of a claim. More specifically, his action provides no evidence of animus against Dr. Lashley on the basis of her sex or her possible disability.

8. **Dr. Lashley Fails to Demonstrate that SMC's Legitimate, Nondiscriminatory Reasons for Declining to Renew Her Contract, and for Terminating Her, Were Mere Pretext.**

In opposition to the Report's conclusions, Dr. Lashley piles on a list of speculative assertions, most of which lack citation to any record evidence. No juror could reasonably conclude that in February of 2018, Dr. Lashley was a good fit for her position at SMC. Dr. Lashley's own correspondence leads to only one conclusion: she was not a good fit for

SMC. On January 15, 2018, she wrote to colleague Dr. Franks "I just have to get out of SMC." ECF No. 212-12, at pg. 4. On February 5th she emailed Dr. Mark Rubin, of Ashland University, and reported "I am applying everywhere and determined to get the f*** out of there." *Id.*, at pg. 5.

As to the uncontested evidence that SMC's leadership received nearly simultaneous and independent reports of Dr. Lashley's threatening conduct immediately before her termination, Plaintiff marshals a litany of factors that are either unsupported by the record or patently immaterial. Whether Dr. Keisler's or Ms. Turner's reports strictly complied with SMC's workplace violence policies have no bearing on whether the reports were accurate or reasonably relied upon. Moreover, Ms. Ferguson testified, and there is no evidence disputing, that she called the solicitor's office to inquire if Dr. Lashley's conduct warranted law enforcement's participation. ECF No. 212-13, at 72:17-73:8. These reports were made, directly or indirectly, to Ms. Ferguson, a Class One law enforcement officer and SMC's chief of campus security was on vacation at the time. ECF No. 212-14, at 52:2-24.  Although she complains that surveillance videos, Plaintiff never requested these in discovery. Even if such a request had been made, there is no evidence that video surveillance videos (assuming they ever existed) would show a) that Dr. Lashley spoke with students on Walker Building on February 14th or, b) that she entered Dr. Keisler's office on February 15th. Moreover, these complaints are immaterial as these facts are not disputed. Ms. Seeley testified to the conversation on February 14th. ECF No. 243-7, at ¶¶ 8-9. Plaintiff admits she met with Dr. Keisler in his office. ECF No. 115-2, at 121:15-122:11.

11

There is no dispute that President Cochran investigated the reports prior to Plaintiff's termination. ECF No. 212-5, at ¶¶ 5-11. Plaintiff fails explain how a Title IX investigation into her termination, or an investigation into her "whistleblower complaints" would make the validity of Dr. Keisler's and Ms. Turner's reports more or less certain. Although Plaintiff cites Katlyn Seeley's affidavit as evidence that Ms. Turner's report was inaccurate, the affidavit confirms that on February 14th Seeley met with Dr. Lashley and three or four other students while Ms. Turner was present. ECF No. 243-7, at ¶¶ 8-9. Instead of denying the statement reported by Ms. Turner, Seeley avers that "I never heard Dr. Lashley make any type of comment while Ms. Turner was present that could remotely be construed as a threat." *Id.*, at ¶¶ 8, 9, and 12. This cannot create a dispute about whether the statement was or was not made, only about the interpretation to be afforded to Dr. Lashley's words. Understandably, Ms. Turner qualified her report by stating "hopefully Dr. Lashley was expressing emotions and did not actually mean to carry out anything adverse on campus." ECF No. 212-3, at pg. 77.

### 9. The Magistrate Judge Appropriately Cited Plaintiff's Incriminating Text Messages.

Plaintiff, no doubt, would prefer to distract the Court from considering the voluminous record of her text messages and emails with students, colleagues, and family about her time at SMC. However, she cannot claim that SMC's conclusion that she was "not a good fit" for SMC is a "meaningless tautology" when Dr. Lashley's words state precisely the same conclusion. *See* ECF No. 212-1, at pg. 8. Though she argues these text messages were taken "out of context," she makes no attempt to correct the reader's reasonable interpretation of her words.

### 10. & 11.      Dr. Gibbs' Inquiries were Objectively Job Related and Consistent with SMC's Business Necessities.

In opposition to the Magistrate Judge's conclusion that Plaintiff failed to establish a claim for unlawful health inquiry, Plaintiff cannot demonstrate that, when analyzed objectively, Dr. Gibbs departed from the ADA regulations requiring "an informal, interactive process" to find a reasonable accommodation. 16 C.F.R. § 1630.2(o)(3). Such a process is necessary to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Nevertheless, she argues that when he said "tell me about your health issues," Dr. Gibbs violated the ADA.

The phrase "job-related and consistent with business necessity" is not defined by the ADA statutes. Whether a medical inquiry is job-related and consistent with business necessity "is an objective inquiry." *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019) (citation omitted). The standard is met if the employer reasonably believes that an employee's medical condition impairs his "ability to perform the essential functions of the job" or "the employee poses a direct threat to himself or others." *Id.* Dr. Gibbs' inquiry falls within the first category. As an objective inquiry, Plaintiff's representation of Dr. Gibbs' demeanor during the meeting is not material.

Viewed objectively, Dr. Gibbs' inquiries comply with the analysis applied in the Fourth Circuit. As described above, Dr. Lashley complained to a maintenance worker that "she had been sick since she arrived" at SMC, and that "she was going to her pulmonology doctor to have her lungs swabbed." ECF No. 212-4, at pg. 12. Dr. Gibbs met with Plaintiff on January 30th to learn more and determine if SMC could accommodate

13

her concerns. *Id.*, at ¶¶ 18-19. Dr Lashley was a full-time professor teaching in person courses at SMC. That position required that she be on campus for scheduled classes, office hours, and faculty meetings. *Id.*, at ¶ 20. As such, she could not perform the essential functions of her job (absent a reasonable accommodation) if her health was adversely affected by conditions within the Walker Building. Therefore, the Magistrate Judge's quite reasonable reference to evidence tending to undermine Plaintiff's *post-hoc* description of their conversation does not negate SMC's entitlement to summary judgment for Dr. Gibbs' lawful medical inquiry.

The fact finder cannot reasonably find that Dr. Gibbs' questions about Dr. Lashley's health problems were other than job-related and consistent with business necessity. Plaintiff complained to a maintenance worker that "she had been sick since she arrived" at SMC, and that "she was going to her pulmonology doctor to have her lungs swabbed." ECF No. 212-4, at pg. 12. SMC's maintenance director, Marty Wood, concluded that "if she feels that Walker is causing her respiratory distress then we should immediately relocate her to another building on campus." *Id.*

### a. Plaintiff's Voluntary Disclosures

It is undisputed that Dr. Gibbs met with Plaintiff on January 30th following her reports of respiratory problems arising from alleged mold in the Walker Building. She argues in her objections that this was an "open ended inquiry" and that her prior (and thoroughly documented) disclosures of her health conditions did not preclude a finding that Dr. Gibbs violated the ADA. However, the Fourth Circuit's holdings on this point foreclose her objections.

"The Rehabilitation Act does not protect information shared voluntarily." *Hannah P. v. Coats*, 916 F.3d 327, 340 (4th Cir. 2019). The court in *Hannah P.* analyzed a plaintiff's claim that her employer violated the ADA by submitting an Employee Assistance Program ("EAP") referral referring to her depression diagnosis. The *Hannah P.* plaintiff's disclosure was made in response to an inquiry by her supervisor about her absence from work. She argued that because her disclosure was made in this context, her supervisor was "fishing for medical information" and her disclosure was not voluntary. *Id.*, 916 F.3d at 341. Similarly, Plaintiff alleges that in response to Dr. Gibbs' question, she "reluctantly responded that she had been diagnosed with Lupus since 2004, that she had asthma all of her life, that she suffers from post-traumatic stress disorder, and that she currently had severe GI issues, which required her to report to work in adult diapers." ECF No. 1, at ¶ 21. However, where the record "clearly show[ed]" that the appellant "disclosed his medical condition voluntarily," the Fourth Circuit does not impose liability under the ADA. *Hannah P.*, 916 F.3d at 340 (citing *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012)).

### b. Reliance on Text Messages

Dr. Lashley objection to the Magistrate Judge's citation to her text message correspondence with Dr. Mark Gibbs is immaterial. This is because Dr. Gibbs' alleged demeanor is not material to her claim that he engaged in an improper inquiry into her health issues. The Magistrate Judge correctly concluded that Dr. Gibbs did not violate the ADA when he asked Dr. Lashley about her health issues on January 30th. This conclusion necessarily follows from an objective inquiry into the circumstances of Dr. Gibbs' meeting with Plaintiff on that date.

15

Plaintiff alleges that due to Dr. Gibbs' health inquiries, she "suffered and continues to suffer significant … mental and emotional distress." ECF No. 1, at ¶ 105. Evidence of these damages must reasonably be analyzed in light of the undisputed text message record, which shows that Dr. Lashley texted Dr. Gibbs about his recent illness and wrote, "[a]t least you're not wearing diapers 😂😂😂😂😂." ECF No. 249, at pg. 17.

Plaintiff, for the first time, attacks the Magistrate Judge's citation to Dr. Lashley's incriminating text messages. She argues that the Magistrate Judge accepted the record of her text message history "without foundation whatsoever and with (sic) a valid citation to any competent evidence in the record." ECF No. 266, at pg. 8. However, Dr. Lashley makes no attempt to show that her text message history was not "presented in a form that would be admissible in evidence." FRCP 56(c)(2). She cannot because she previously admitted the truth and accuracy of the text messages and admitted that her own computer forensic consultant obtained and produced the texts. Exhibit B, Plaintiff's Answers to Requests to Admit, dated December 22, 2020. Therefore, Plaintiff cannot credibly object to the use of her own text messages.

**12.    As to Her Title IX Retaliation Claims, Dr. Lashley Cannot Demonstrate that SMC's Nondiscriminatory Reasons for Declining to Renew Her Contract, and for Terminating Her, Were Mere Pretext.**

As to her Title IX Retaliation claim, Plaintiff argues that the Magistrate Judge erred in "accepting [SMC's] proferred legitimate, non-retaliatory explanation" for declining to offer Dr. Lashley a second contract, and for later terminating her employment. Defendants reassert their arguments *supra* regarding Plaintiff's defunct ADA Retaliation claim. Here, Plaintiff disagrees with the MG without informing the Court of any specific legal error and

16

without identifying record evidence giving rise to a genuine dispute of material facts. Therefore, her objections do not impeach the MG's findings and recommendations.

As the MG points out, Dr. Lashley was offered (and she accepted) a new contract to teach an additional class on January 9, 2018, which was after her reports of potential Title IX issues involving students. The MG correctly discounted Dr. Lashley's "evidence" in the form of her verified complaint, regarding SMC's internal deliberations and conclusions regarding several Title IX reports. As Jenny Dunn attests, though she was a mandatory reporter, Dr. Lashley was not authorized to participate in Title IX investigations or proceedings. Accordingly, her verified complaint cannot provide evidence of matters outside of her personal knowledge. Finally, as to Dale Hyder's alleged conduct, the MG correctly found that, Plaintiff's speculations notwithstanding, there is no record evidence that the adjunct professor's comments were made on the basis of Plaintiff's sex.

## 13.  The Magistrate Judge Correctly Found That Dr. Lashley Has No Entitlement to Recover under ERISA.

Plaintiff argues, without pointing to any evidence in the record, that the documents SMC sent after her termination "were plainly not the documents Plaintiff's counsel requested." ECF No. 266, at pg. 9. If this is so plain, citing the record for evidence to support her objection should be simple. Dr. Lashley's objections do not meaningfully address the Magistrate Judge's findings that SMC provided Plaintiff with the relevant benefits documents on March 1, 2018, shortly after her termination.

Perhaps more importantly, Plaintiff never demonstrated that she suffered an injury-in-fact due to the delay between SMC mailing the first set of employment benefits information and the second set several months later. Dr. Lashley has provided not a shred of evidence that she attempted to access, but was denied benefits, continuation of

17

coverage under short-term or long-term disability policies, or conversion of her life insurance benefits provided by SMC. The Court should not reward Plaintiff's attorney's gamesmanship when Dr. Lashley cannot identify any actual inconvenience (much less harm) resulting from this delay.

### 14. In Error Plaintiff Relies on Her Verified Complaint Regarding Her Defamation Claims

As to Plaintiff's defamation claims, Dr. Lashley conflates the Court's obligation to draw inferences in favor of the non-moving party with her invitation to credit speculative assertions as fact.[6] Plaintiff continues to cite her verified complaint to survive summary judgment despite the clear showing that she lacks personal knowledge of the facts alleged therein. As argued in Defendants' reply brief (entry no. 249), "a verified complaint for summary judgment purposes is only appropriate when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Again, Dr. Lashley argues without reference to any evidence in the record that a text message about Dr. Lashley "spread like wildfire" and "was widely circulated … to students, faculty, and staff within SMC…." ECF No. 266, at pgs. 9-10. Plaintiff's repetition of her allegations cannot assist her now. She does not explain why the unauthorized forwarding of such a text message makes SMC's employees more or less entitled to the qualified privilege protecting communications of this sort.

---

[6]    Plaintiff does not object to the Magistrate Judge's finding that, with the exception of the text message sent by Ms. Gilliam and the reports of Ms. Turner and Dr. Keisler to SMC's administration regarding the plaintiff's alleged threatening statements, Plaintiff has abandoned her claims for defamation. ECF No. 254, at pg. 59.

**15.     Plaintiff is not Entitled to Recover for SMC's Alleged Wrongful Termination in Violation of Public Policy**

As noted by the MJ, Dr. Lashley concedes that her claims for retaliation addressed in connection with specific statutory remedies, such as the ADA, Title IX, and Title VII, cannot be simultaneously pursued under the holding of *Lawson v. South Carolina Dep't of Corrs.*, 340 S.C. 346, 350, 532 S.E.2d 259, 260 (2000). Also, Dr. Lashley's objection to the Report fails to address the distinction drawn by South Carolina courts between "a contract for a definite term and an at-will contract." *Cunningham v. Anderson Cty.*, 414 S.C. 298, 303, 778 S.E.2d 884, 886 (2015). There is no disagreement that Plaintiff's employment contract was for a definite term from July 1, 2017, to May 8, 2018. ECF No. 212-2, at pg. 191. In contrast to the South Carolina case of *Stiles v. Am. Gen. Life Ins. Co.*, the SMC contract contains no comparable "notice provision." 335 S.C. 222, 225, 516 S.E.2d 449, 451 (1999), Accordingly, the Magistrate Judge correctly concluded that Plaintiff cannot maintain a claim for wrongful termination in violation of public policy.

As to Plaintiff's argument that "all contracts including contracts of employment include an implied covenant of good faith and fair dealing," this statement of law only reinforces that conclusion reached by the MJ. ECF No. 266, at pg. 10. Plaintiff's intolerable conduct obviated any claim she may have had for breach of the implied covenant of good faith and fair dealing.  In *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, the South Carolina Supreme Court affirmed the Court of Appeals' holding that a party in default on a contact could not maintain an action for breach of the implied covenant. 334 S.C. 469, 487, 514 S.E.2d 126, 135 (1999). This is because "one who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate

19

time, able, ready, and willing to perform it." *Id.* (quoting *Parks v. Lyons*, 219 S.C. 40, 48, 64 S.E.2d 123, 126 (1951)). After Dr. Lashley was informed that SMC would not offer her a contract for the 2018-2019 academic year, she engaged in a course of conduct violating SMC's workplace violence policy. Thereafter, she was not able, ready, or willing to perform her contractual obligations at the college. For this reason alone, she is barred from recovery under the doctrine of wrongful termination in violation of public policy.

                HOLCOMBE BOMAR, P.A.

                *s/Todd R. Flippin*

                William B. Darwin, Jr., Fed. ID No. 5422
                Todd R. Flippin, Fed ID No. 11753
                William U. Gunn, Fed ID No. 2501
                HOLCOMBE BOMAR, P.A.
                Post Office Box 1897
                Spartanburg, South Carolina  29304
                (864) 594-5300 (Office)
                (864) 585-3844 (Facsimile)
                kdarwin@holcombebomar.com
                tflippin@holcombebomar.com
                bgunn@holcombebomar.com

                *Attorneys for Defendants*

Spartanburg, South Carolina

February 1, 2022