IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Summer D. Lashley, Ph.D., | Case No.: 7:18-cv-02957-KFM |
| Plaintiff, | |
| vs. | **OPINION & ORDER** |
| Spartanburg Methodist College; W. Scott Cochran; Mark W. Gibbs, Ph.D.; Teresa D. Ferguson; Jonathan Keisler, Ph.D.; Angelia A. Turner; and Clevon A. Boyd, in his individual capacity, | |
| Defendants. | |

This matter is before the Court with the Report and Recommendation of United States Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report"), made in accordance with 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] Plaintiff Summer D. Lashley, Ph.D., ("Plaintiff" or "Lashley") filed this action against Defendant W. Scott Cochran, the President of SMC; Defendant Mark W. Gibbs, Ph.D. ("Dr. Gibbs"), the Dean of Instruction and a Professor of Philosophy and Religion at Spartanburg Methodist College ("SMC"); Defendant Teresa D. Ferguson, the Dean of Students at SMC; Defendant Jonathan J. Keisler, Ph.D., a Professor of Economics at SMC; Defendant Angelia A. Turner, the Director of the Online Criminal Justice Program at SMC; and Defendant Clevon A. Boyd, the former Chief of SMC's Campus Police Department (collectively "Defendants"). Lashley's lawsuit arises out of

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1

her employment and termination as Director of the Criminal Justice Program and Professor of Criminal Justice at SMC during the 2017-2018 school year.

Lashley's lawsuit raises numerous federal and state causes of action to include: 1) breach of contract against SMC; 2) breach of contract accompanied by a fraudulent act against SMC; 3) violation of the South Carolina Payment of Wages Act against SMC and Cochran; 4) defamation – libel and slander per se against all defendants; 5) wrongful termination in violation of public policy against SMC; 6) disability discrimination in violation of the Americans with Disabilities Act ("ADA") against SMC; 7) retaliation in violation of the ADA against SMC; 8) unlawful health inquiry in violation of the ADA against SMC; 9) gender discrimination in violation of Title IX of the Education Amendments Act of 1972 ("Title IX") against SMC; 10) retaliation in violation of Title IX against SMC; 11) hostile work environment, disparate treatment, and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") against SMC; 12) retaliation in violation of Title VII against SMC; 13) invasion of privacy against SMC, Gibbs, and Ferguson; 14) violation of civil rights against Boyd in his individual capacity, pursuant to 42 U.S.C. § 1983; and 15) violation of the Employee Retirement Income Security Act of 1974 ("ERISA") against SMC. (DE 1.) Presently before the Court is Defendants' Motion for Summary Judgment asserting that each of Plaintiff's claims fail as a matter of law. (DE 212.) Plaintiff has filed a response with supplements (DE 242 – 244), and Defendants have replied (DE 249).

On December 20, 2021, the Magistrate Judge issued the Report, recommending summary judgment on all of Plaintiff's federal claims (i.e., sixth (ADA discrimination and failure to accommodate), seventh (ADA retaliation), eighth (ADA unlawful health inquiry), ninth (Title IX gender discrimination), tenth (Title IX retaliation), eleventh (Title VII hostile work environment,

2

disparate treatment, and gender discrimination), twelfth (Title VII retaliation), fourteenth (Section 1983), and fifteenth (ERISA)). (DE 254.) For the reasons stated below, the Court adopts the Report and Recommendation, and grants Defendants' Motion for Summary Judgment on Plaintiff's federal law claims, and the Court declines to retain supplemental jurisdiction over Plaintiff's state law claims.

## BACKGROUND

The Report and Recommendation sets forth the relevant facts and legal standards, which this Court incorporates herein without a full recitation. However, as a brief background relating to the objections raised by Lashley, the Court provides this summary.

In May 2017, the Plaintiff signed a one-year contract to teach criminal justice courses at SMC and to act as the Director of the Criminal Justice Program. (DE 212-2.) The Plaintiff also entered into a separate contract with SMC on January 9, 2018, to teach an additional spring semester course titled, "Intro to Forensics Science." (Id.) Under her contracts with SMC, the Plaintiff taught a full load of criminal justice courses during the Fall 2017 and Spring 2018 semesters. (Id.) The record reflects at the end of the Fall 2017 semester, Plaintiff's supervisor was "pleased" with the Plaintiff's job performance and "happy" to have her at SMC. (DE 212-8.) However, her supervisor was "concerned of the lack of structure." (Id.) By mid to late January 2018, the supervisor had noted the Plaintiff was becoming "emotional, volatile, and … uncontrollable." (Id.) In addition, Plaintiff's office had become a "student lounge." (Id.)

In late January 2018, Plaintiff complained to the maintenance department about what she believed was black mold in the Walker Building at SMC, the building where her office was located. (DE 1, ¶ 78.) Lashley indicated that she had asthma and that her respiratory problems had been exacerbated by the air quality in the building. (Id.) On Sunday, January 28, 2018, the head of

maintenance at SMC, Marty Woods, sent an email to SMC's Executive Vice President of Academic Affairs Dr. Anita Bowles, Dr. Gibbs, and President Cochran about the complaint to a maintenance employee the previous Friday that she saw a ceiling tile in the hallway of the Walker Building that had black mold on it.  (DE 242-4, pp. 114-15.)  Mr. Woods stated that the ceiling tile had gotten wet from a condensation leak from the air handler above, and the ceiling tile had been removed and replaced.  (Id.)  Mr. Woods further indicated that he had spoken to President Cochran about the Plaintiff's complaint, and they agreed that if Lashley felt the building was causing her respiratory distress, they "should immediately relocate her to another building on campus."  (Id.)  Thus, Mr. Woods asked, "[W]here you would like to relocate her so we can prepare the space for her arrival." (Id.)  Dr. Gibbs's email response to Mr. Woods's email about the mold started, "Good Lord!," which Dr. Gibbs testified he meant "[m]aybe 'here we go again. It was a surprise, you know, nothing intended. No deeper meaning there" (Id. at 116.)  Dr. Gibbs met with the Plaintiff on or about January 30, 2018, and the Plaintiff described the meeting as follows:

> And he came and sat down. And no one was there. And he is like, so tell me about your health issues. And he was very angry, and this is right after I had reported the mold and mildew on the ceiling tiles. And I was just taken aback because he is very threatening. He was very angry, and I felt like if I didn't tell him I was going to lose my job. I didn't know. And then he was mad about me reporting the mold and mildew.

(DE 242-6, p. 71.)

In her verified complaint, Lashley stated that she told Dr. Gibbs she had been diagnosed with lupus in 2004, she had asthma all of her life, she suffered from post-traumatic stress disorder ("PTSD"), and she had severe gastrointestinal issues that required her to come to work in adult diapers.  (DE 1, ¶ 21.)  Dr. Gibbs testified in his affidavit that he offered the Plaintiff an alternative office in the Ellis Building because of her complaint about mold in the Walker Building causing her respiratory issues.  (DE 212-4, ¶¶ 18-19.)  Plaintiff testified that Dr. Gibbs described the

4

alternative office as a "closet." (DE 242-6, p. 87.) Dr. Gibbs testified that the office was smaller than the Plaintiff's office in the Walker Building, but it was not a closet. (DE 212-4, ¶ 18.) Further, Dr. Gibbs testified that the office he offered the Plaintiff was larger than his own current office. (DE 212-6, p. 120.) Although the office is windowless, so are the offices of other SMC professors. (DE 212-11, p. 65.) The office in the Ellis Building was a three-minute walk from the Plaintiff's classrooms in the Walker Building. (Id. at p. 73.) Dr. Gibbs testified that the information he sought from the Plaintiff regarding her health issues was "needed to assess what could be done to accommodate her health," and he never sought more information than needed to engage in that process. (Id. at ¶ 19.)

On February 5, 2018, Plaintiff emailed Ms. Dunn, asking who at SMC handled reasonable accommodations and requesting reasonable accommodation paperwork. (DE 212-2.) Ms. Dunn responded the same day, providing the Plaintiff with a request for accommodation form, along with the faculty policy handbook and labor manual the Plaintiff had also requested. (Id.) On February 7, 2018, Lashley emailed Ms. Dunn and informed her that she was diagnosed with Crohn's disease, that she had informed her immediate supervisor of her diagnosis, and that she expected the information to remain confidential. (Id.) Lashley never returned the reasonable accommodation form. (Id.)

In January 2018, Dr. Gibbs evaluated faculty to determine candidates for contracts for employment during the 2018-2019 academic year. SMC's policy was to inform staff members by February 15 of the spring semester if they would be offered a contract for the next year. (DE 212-4, aff. ¶ 4.) Dr. Gibbs testified in his affidavit that he identified multiple incidents leading to his conclusion that SMC was not a good fit for Plaintiff. (Id. at ¶ 5.) First, beginning in August 2017, the Plaintiff began complaining to Dr. Gibbs about conflicts with students, faculty, and staff. (Id.)

5

According to Dr. Gibbs, these conflicts increased during the course of the Plaintiff's short time at SMC and reached an intolerable level by late January 2018. (Id.) Dr. Gibbs testified that the Plaintiff's conflicts and complaints were quite regular and indicated to him that the Plaintiff was having difficulty getting settled into her position. (DE 212-6, p. 77.) Second, in the early weeks of the Fall 2017 semester, Lashley was interviewed for a press release and for SMC's online publication. (DE 212-4, ¶ 5(b).) SMC's Vice President for Marketing, Lisa Ware, received multiple complaints from Plaintiff regarding these publications. Despite Plaintiff's express, written acknowledgment of these publications, Plaintiff demanded that Ms. Ware contact the local newspaper to have the articles retracted. Ms. Ware reported to Ms. Dunn "the erratic and confused tone of [the plaintiff's] requests and complaints" during their interactions. (Id.)

Third, Plaintiff also made repeated complaints about Dale Hyder, an adjunct faculty member. (DE 212-4, aff. ¶ 5(c).) As Director of the Criminal Justice Program, Plaintiff was Mr. Hyder's direct supervisor. (DE 212-6, p. 87.) Regarding their conflict, Dr. Gibbs described the Plaintiff as "a true academic" and Mr. Hyder as a "cop's cop." (Id. at 85-86.) Plaintiff complained that Mr. Hyder undermined her in the classroom by stating his opinion regarding academics who lacked law enforcement experience. Dr. Gibbs met with other faculty members and Mr. Hyder to discuss Plaintiff's complaints. (DE 212-4, aff. ¶ 5(c).) Plaintiff's conflict with Mr. Hyder escalated in late January 2018. (Id.) At that time, Plaintiff asked students to report to Dr. Gibbs their conflicts with Mr. Hyder. (Id.) Plaintiff informed Dr. Gibbs that two students were worried that Mr. Hyder would retaliate against them because of Mr. Hyder's comments about the Plaintiff. Dr. Gibbs met with the students, and it was his assessment that Plaintiff simply had a personality conflict with Mr. Hyder, but she was allowing the conflict to disproportionately affect her job performance. (Id.)

In the weeks leading up to the February 15 deadline for informing staff members if they would be offered a contract for the next year, Dr. Gibbs held discussions with Dr. Bowles regarding the Plaintiff's status for the next academic year. Dr. Gibbs testified that he concluded, based on his experience working with Lashley and based on Dr. Bowles' input, that Lashley and SMC were not a good fit for each other. (DE 212-4, aff. ¶ 4.) Dr. Gibbs met with President Cochran and Dr. Bowles approximately a week prior to February 13, 2018, to present his recommendation that Plaintiff not be offered a contract for the next academic year. (Id. at ¶ 6.) That recommendation was accepted by President Cochran and Dr. Bowles. Plaintiff was informed her contract would not be renewed on February 13, 2018.

In a written statement, Angelia Turner stated that on Wednesday, February 14, 2018, she overheard Plaintiff speaking with a group of students and state that she felt like "blowing the school up." (DE 212-3, aff. ex. I & J.) Ms. Turner stated that the following day, she reported the Plaintiff's comment to Dr. Gibbs at a Board of Trustees luncheon, telling Dr. Gibbs that she did not think Lashley "was serious," but she did "feel an obligation to say something . . . , just in case." (DE 244-1, pp. 122, 128.) In her deposition, Plaintiff denied ever making any such comment, stating, "That would never, ever come out of my mouth." (DE 242-6, pp. 94-96.)

Dr. Jonathan Keisler, Professor of Economics at SMC, testified that on February 15, 2018, Lashley entered his office at SMC, closed the door, and began to complain about Dr. Gibbs and President Cochran. (DE 212-3, aff. ex. I & J.) She claimed that SMC had fired her unfairly. According to Dr. Keisler, Lashley stayed in his office for about 45 minutes and became increasingly agitated. At one point, she said, "Bad stuff happens when people cross me. My dad says it's true. They turn up dead." Dr. Keisler testified that the Plaintiff specifically mentioned Dr. Gibbs and President Cochran, calling them "evil people" and declaring that they would "get

7

theirs." (Id.) In her deposition, Lashley denied every making such a comment. (DE 242-6, pp. 114-15.) Dr. Keisler testified that he reported Lashley's comments to Dr. Gibbs because he "was genuinely concerned that she might be angry enough to harm someone." (DE 212-3.)

On February 15, 2018, President Cochran met with Ms. Ferguson, Dr. Bowles, and Dr. Gibbs regarding the Plaintiff's conduct following the February 13 meeting when she was informed that her contract would not be renewed. (DE 212-5, aff. ¶ 5.) Dr. Gibbs reported that Lashley confronted him on February 13, and President Cochran also learned of Ms. Turner's report that Lashley stated to students that she "felt like blowing up" the school. In his affidavit, President Cochran noted that February 14 was the date of the school shooting in Parkland, Florida. (Id. at ¶¶ 5-6). On or about February 16, President Cochran was informed that Dr. Keisler reported that Lashley made troubling comments to him about President Cochran and Dr. Gibbs. (Id. at ¶ 7.) On February 16, 2018, President Cochran and Ms. Ferguson informed the Plaintiff of her immediate termination of employment. (DE 212-5, ¶ 8.) President Cochran testified in his affidavit that he told Lashley that her termination was the result of her unprofessional, inappropriate interactions and conversations with SMC's faculty, and he instructed Plaintiff to leave campus as soon as she could gather her possessions. (Id.) Plaintiff stated in her verified complaint that President Cochran did not explain why she was being terminated immediately, other than to say, "in a loud, hostile voice while hovering over her desk, 'Because of conversations!'" (DE 1, ¶ 24.)

## **DISCUSSION**

Plaintiff filed an Objection to the Report on January 18, 2022, identifying fifteen numbered paragraphs raising numerous objections to the Report. (DE 266.) However, to be actionable, objections to a report and recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the

recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute*.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, the Court finds that many of the Plaintiff's objections are non-specific, unrelated to the dispositive and/or at the heart of disputed portions of the Report and Recommendation, or merely restate her arguments. However, the Court has identified the following specific objections, which will be addressed herein.[1] Plaintiff objects to the Report claiming that "the Magistrate Judge erred in examining Plaintiff's [gastrointestinal] GI issues and her asthma as the only disabilities entitled to protection under the ADA." (DE 266, p. 2.) Rather, Plaintiff contends she met the definition of a "qualified individual with a disability" as to her other health conditions (i.e., asthma, PTSD, and lupus). However, this objection does not address the substance of the Report's recommendation. The Report states that

> the plaintiff has presented no evidence supporting her claim that these impairments substantially limit one or more of her major life activities (see id.). 42 U.S.C. § 12102(1). Nonetheless, as the plaintiff has presented sufficient evidence upon which a reasonable jury could conclude that her gastrointestinal issues are a disability within the meaning of the ADA, she can satisfy the first element of a prima facie case.

---

[1] Plaintiff's First, Fourteenth, and Fifteenth objections address alleged deficiencies in the Report regarding Plaintiff's state law claims. Since the Court has adopted the Reports' recommendations, the Court declines to address these objections because the Court will not entertain supplemental jurisdiction over Plaintiff's state law claims.

(DE 254, pp. 18-19.) Plaintiff's objection simply disagrees with the Report but fails to point to evidence in the record to contradict its finding. Moreover, this Court's review of the record equally reveals Plaintiff has not presented any evidence to support her claim that these other health conditions limit one or more of her major life activities or a defect in the Report's singular finding that her GI condition satisfies the first element of a prima facie case. To that end, the Court overrules this objection.

Next, in Paragraph Three of Plaintiff's objection she alleges that "[t]he Magistrate Judge erred in concluding that Defendants SMC met its obligation under the ADA to engage in discussion of reasonable accommodations because it offered to move Plaintiff's office into another building after her mold complaint." (DE 266, p. 3.) Instead, Plaintiff claims that she sought accommodations for her GI issues not the mold. While Plaintiff contends these arguments weigh against granting summary judgment at this time, Plaintiff fails to cite evidence in the record to support theses contentions. To the contrary, the Report ably and comprehensively reveals a different record before the Court. For instance, the Report states,

> the evidence before the court shows that the plaintiff emailed Ms. Dunn on February 5, 2018, requesting reasonable accommodation paperwork, and Ms. Dunn responded and provided the request for accommodation form that same day. On February 7, 2018, the plaintiff emailed Ms. Dunn and informed her that she was diagnosed with Crohn's disease. However, the plaintiff did not inform Ms. Dunn in any of the emails that her diagnosis limited her ability to work, nor did the plaintiff describe a need for an accommodation to perform the essential functions of her position. Further, the plaintiff never returned the reasonable accommodation form (doc. 212-2, Dunn aff. ¶¶ 16-19 & ex. E), and Ms. Dunn testified that the plaintiff did not otherwise request to have her office moved (doc. 249-2, Dunn dep. 201).

(DE 254, pp. 19-20.) However, Plaintiff's objections fail to offer anything in the record to contradict these findings or to show an error of law. "[I]n order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2)

10

that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Further, "[t]he duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." Id. at 346–47. Furthermore, "even if an employer's duty to engage in the interactive process is triggered, the employer's liability for failing to engage in that process may collapse . . . if the employee cannot identify a reasonable accommodation that would have been possible." Id. at 347. Here, Plaintiff's objection and the record do not support either contention; therefore, Plaintiff's objection fails to show that SMC refused to make a reasonable accommodation.[2]

Furthermore, Plaintiff's objection in Paragraph Six asserts that "the Magistrate Judge unfairly down-plays the apparent discriminatory animus of Defendant Gibbs, who was the driving force behind both the non-renewal decision and the termination decision." (DE 266, 4-5.) The Court disagrees. To bring a wrongful discharge claim under the ADA, "a plaintiff must prove '(1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that her employer discharged her (or took other adverse employment action) because of her

---

[2]    Similarly, Plaintiff's objections in Paragraphs Four and Five equally are without merit because they ignore Plaintiff's burden under the ADA, to include her duty to inform her employer of her "desire for an accommodation for that disability." Wilson at 346-347. For instance, Plaintiff's objection in Paragraph Four, suggests the Magistrate Judge erred in dismissing Plaintiff's failure-to-accommodate claim under the ADA "based on Plaintiff's alleged failure to return the reasonable accommodation form given to her by Ms. Dunn." Plaintiff's explanation for her failure to return the form was "that she thought (perhaps mistakenly) the form required input from her doctor is a reasonable assumption or expectation, especially where the form specifically states that "additional medical certification may be requested." (DE 212-3, at 39.) Furthermore, Plaintiff's objection in Paragraph Five is predicated on a finding of a disability which the Report recommends "that her gastrointestinal issues are a disability within the meaning of the ADA, [and that] she can satisfy the first element of a prima facie case." (DE 254, pp. 18-19.) Rather the objections fail to point to SMC's refusal to accommodate this condition as what causes this objection to fail.

11

disability.'" Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015) (quoting EEOC v. Stowe–Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000)). See Gentry v. E. W. Partners Club Mgmt. Co. Inc., 816 F.3d 228, 235-36 (4th Cir. 2016) (holding that the ADA requires that a plaintiff's disability be a but-for cause of the adverse employment action). The Report recommends dismissal of this claim because "plaintiff has failed to prove that her alleged disability was the "but for" cause of either her contract not being renewed or her termination from employment . . . ." (DE 254, p. 23.) To that end, the recommendation is predicated on a finding that

> the evidence of record fails to indicate that the individuals involved in the decisions to not renew the plaintiff's contract (President Cochran, Dr. Bowles, and Dr. Gibbs) and terminate her employment (President Cochran, Ms. Ferguson, Dr. Bowles, and Dr. Gibbs) possessed discriminatory animus linked to the plaintiff's underlying medical conditions.

While the Report suggests that Plaintiff's claim may be better suited in the retaliation context because Lashley relies on the "close proximity in time between her confrontation by Dr. Gibbs to tell her about her health conditions, her requested accommodation to move her office closer to the restroom, and the adverse employment actions" (DE 242, p. 24), this argument and the Report's suggestion is not outcome determinative unlike the "but for" analysis. Accordingly, this objection fails.

Next, Plaintiff's objection in Paragraph Seven, asserts that "[t]here was also substantial evidence that Defendant Cochran also possessed unlawful, discriminatory animus against Plaintiff [because of his] decision unilaterally to rescind the promise to pay Plaintiff's salary and benefits through the end of her original contract term and then to deny Plaintiff a grievance hearing, a Title IX investigation, or a whistle-blower hearing . . . ." (DE 266, p. 5.) The Report indicates that SMC ultimately paid Plaintiff "the balance of her salary under the contract as well as COBRA premiums through the contract term." (DE 254, p. 25, n.10.) Moreover, Plaintiff's remaining

objections are nonspecific because she fails to identify a protected activity or any conduct by Defendant Cochran that is related to an adverse activity or protected action. To establish a prima facie case of retaliation, a plaintiff is required to "show (1) that she engaged in protected activity; (2) that her employer took an adverse action against her; and (3) that a causal connection existed between the adverse activity and the protected action." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 578 (4th Cir. 2015) (alterations and internal quotation marks omitted). The Fourth Circuit applies "the same standards in ruling on a Title IX retaliation claim that we do in ruling on a Title VII claim." Stennis v. Bowie State Univ., 716 F. App'x 164, 166 (4th Cir. 2017). Plaintiff has not made a connection between Defendant Cochran's alleged discriminatory animus and the protected action. "Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII." Id. "Activities that constitute participation are outlined in the statute: (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id. at 166; (Finding that "participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause.").

As to Plaintiff's objection in Paragraphs Eight, Nine, and Twelve, she argues that "the Magistrate Judge erred in accepting Defendants' alleged legitimate, non-retaliatory reasons for the adverse actions taken against Plaintiff–namely, the statement that Plaintiff was not a 'good fit' with SMC and the allegedly threatening comments reported by Defendants Turner and Keisler."[3] (DE 266, pp. 6-7.) Plaintiff takes exception to Defendants "good fit" non-retaliatory reason for

---

[3] In addition, Plaintiff contends that the Magistrate Judge erred in accepting the uncorroborated accounts of Defendants Turner and Keisler about comments that Plaintiff reportedly made as non-retaliatory reasons for the adverse actions taken against her. (DE 266, p. 5-6.)

the adverse action taken against her as a pretext for her retaliation claim under the ADA because "Defendant Gibbs's deposition testimony plainly indicates that he was unhappy with the repeated complaining by Plaintiff, almost all of which constitutes protected activity under various federal laws (e.g., ADA or Title IX)." (DE 266, p. 6.)  Protected activities fall into two distinct categories: participation or opposition. See 42 U.S.C.A. § 2000e-3(a). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). "Activities that constitute participation are outlined in the statute: (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id at 259.  While Plaintiff's complaint may be considered protected activities, the Report ably and comprehensively shows that Plaintiff has not met her burden to show that SMC's purported nonretaliatory reasons were not its true reasons, but were a pretext for Title IX retaliation.  For instance, the Report states,

> The plaintiff's argument that her contract was not renewed and she was terminated from employment in retaliation for her complaints on behalf of female students is undermined by the fact that defendant SMC entered into a separate contract with the plaintiff on January 9, 2018, to teach an additional spring semester course titled, "Intro to Forensics Science" (doc. 212-2, Dunn aff. ¶ 4 & ex. B at 3).  This additional contract was entered after the plaintiff's emails to Ms. Dunn on September 29 and 30 and December 6, 2017, regarding several incidents involving student athletes (doc. 242-5, Dunn dep. 120-27).  Moreover, the plaintiff's claim that her complaints about potential violations of Title IX were the reason for the non-renewal of her contract is undermined by the undisputed testimony of Ms. Dunn that she was not consulted about SMC's decision to not offer the plaintiff another contract (doc. 212-4, Gibbs aff. ¶ 6; doc. 212-2, Dunn aff. ¶ 13).  Moreover, Ms. Dunn testified that she did not contribute to defendant SMC's decision to terminate the plaintiff's employment (doc. 212-2, Dunn aff. ¶ 13).  Further, Dr. Gibbs testified that while he had heard of "some behavior issues with student athletes," he was not aware of the plaintiff's reports of such (doc. 249-3, Gibbs dep. 108-09).

(DE 254, p. 41.) In order "to carry her burden at the pretext stage of showing 'that retaliation was a but-for cause' of her termination, [the plaintiff] must present evidence to 'establish both that the employer's reason [for the termination] was false and that retaliation was the real reason for the challenged conduct.'" Cole v. Fam. Dollar Stores of Maryland, Inc., 811 F. App'x 168, 174 (4th Cir. 2020) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015). Here, retaliation for raising complaints was not the real reason for SMC not renewing her contract because it was renewed after the complaints were made. Furthermore, as noted in the Report, there is nothing in the record to refute that "the decisionmakers in this case did not honestly believe that the plaintiff was not a good fit for SMC in making the decision to not renew her contract or that the decisionmakers did not honestly believe that the plaintiff had made the threatening comments that were reported to them in making the decision to terminate her employment." (DE 254, p. 42.) Accordingly, Plaintiff's objections in Paragraphs Eight, Nine, and Twelve are overruled.

Next, Plaintiff objects in Paragraph Ten regarding her claim for unlawful health inquiry in violation of the ADA that "the Magistrate Judge improperly accepted the self-serving, conclusory statements in Defendant Gibbs's affidavit that 'the information he sought from the plaintiff regarding her health issues was 'needed to assess what could be done to accommodate her health,' and he never sought more information that needed to engage in that process." (DE 266, p. 7.) In addition, Plaintiff objects in Paragraph Eleven that the "Magistrate Judge improperly determined that Plaintiff's testimony about Dr. Gibbs's 'very angry' and 'threatening' demeanor during the meeting in which he demanded information about her health conditions was 'undermined' by certain text messages. . . ." (DE 266, p. 8.) First, as to the health inquiry request for information by Defendant Gibbs, Plaintiff's objection fails to articulate a legal dispute. The parties do not dispute that the ADA prohibits an employer from making "inquiries of an employee as to whether

15

such employee is an individual with a disability or as to the nature or severity of the disability, *unless* such . . . inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A) (emphasis added). Here, Plaintiff does not dispute that she discussed her health issues with numerous co-workers, including Dr. Gibbs, as well as students, albeit for purposes of cancelling classes or explaining an absence from work. As noted in the Report,

> the plaintiff's claim that she only informed Dr. Gibbs of her health problems when he confronted her while he was "very angry" and "threatening" (doc. 242-6, pl. dep. 71) is undermined by evidence showing text messages between the plaintiff and Dr. Gibbs a few days later when she invited Dr. Gibbs to "call her at home," stating that she was "still having symptoms" (doc. 249 at 17). When Dr. Gibbs stated that he had a deep cough, the plaintiff responded, "At least you're not wearing diapers" followed by laughing emojis (id.).

(DE 254, p. 30.) The fact that Defendant Gibbs's request for information about Plaintiff's health condition was coupled with "threatening" or "very angry" tones or speech does not alter the propriety or lawful nature of the request. Based upon the evidence of record, a reasonable jury could not determine that Defendant SMC made an unlawful health inquiry in violation of the ADA, notwithstanding how it was delivered. Therefore, the Court rejects Plaintiff's objections in Paragraphs Ten and Eleven.

Finally, as to Plaintiff's objection in Paragraph Thirteen where she alleges "the Magistrate Judge improperly recommends summary judgment in favor of Defendants because the COBRA documents mailed to Plaintiff on or about March 1, 2018, were plainly not the documents Plaintiff's counsel requested by letter dated March 6, 2018, lacks merit. (DE 266, p. 9.) As a threshold matter, Lashley's ERISA claim arises from an alleged failure to provide her with certain documents within 30 days after her written request. (DE 1, comp. ¶¶ 173-74). "ERISA requires [a plan] administrator 'upon written request of any participant or beneficiary, [to] furnish a copy of the latest updated summary plan description, plan description ... contract, or other instruments under which the plan is established or operated.'" Glocker v. W.R. Grace & Co., 974 F.2d 540,

16

544 (4th Cir. 1992). ERISA provides that a plan administrator who fails to comply with a request for information that the administrator is required to furnish to a participant by mailing the requested material within 30 days after such request *may, in the court's discretion*, be liable to the participant in the amount of up to $100 a day. See 29 U.S.C. § 1132(c)(1) (emphasis added). Plaintiff does not dispute that

> on March 1, 2018, after the plaintiff's termination from employment, [Ms. Dunn] provided the plaintiff "all relevant post-termination benefits information" (doc. 212-2, Dunn aff. ¶ & ex. H). Exhibit H to Ms. Dunn's affidavit shows that the specific documents provided to the plaintiff included forms for converting the plaintiff's SMC life insurance and long-term disability plans to private plans and COBRA information (doc. 212-3 at 53-74).

(DE 245, p. 45.) Rather, Plaintiff alleges that SMC was late in responding to its March 6, 2018, request for information, and the March 1, 2018, information was not the documentation requested by Plaintiff's counsel. (DE 242, p. 32.) Plaintiff contends "Defendants did not provide the requested information until November 5, 2018, after this lawsuit was filed." (Id.) However, Plaintiff's objection ignores the Report's recommendation that "the plaintiff has failed to present evidence regarding what 'plan documents for any employee welfare benefit plan in which she was a participant during her employment with SMC' existed that the defendant failed to provide to her." (DE 254, p. 46.) Stated differently, what documents were omitted from the March 1, 2018, transmittal compared to the November 5, 2018, offering. The purpose of allowing a claimant whose benefits have been denied to examine documents is to ensure that the claimant can meaningfully participate in the review process required by 29 U.S.C. § 1133. However, the undisputed evidence before the Court is that Defendant SMC paid the Plaintiff's COBRA premiums through the expiration of her contract term. (DE 245, p. 45.)

> The purpose of § 502(c)(1) is not to compensate participants for injuries, but to punish noncompliance with ERISA. Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1494 (11th Cir. 1993). Accordingly, prejudice to the party requesting the documents is not a prerequisite to the imposition of penalties. See Moothart v. Bell,

> 21 F.3d 1499, 1506 (10th Cir. 1994). But prejudice is a factor that a district court may consider in deciding whether to impose a penalty. Id. The district court may also consider whether the administrator acted in bad faith.

Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir. 1996). Plaintiff has not offered any evidence to support her claim that Defendants failed to provide her plan documents. Furthermore, given SMC provided the documents twice (before the request and albeit late the second time) and paid Plaintiff's COBRA premiums, there is no evidence of bad faith or prejudice to the Plaintiff. Given the facts in this case and the discretion afforded the Court regarding the imposition of a penalty, summary judgment is appropriate on Plaintiff's ERISA violation claim for penalties. Accordingly, Plaintiff's objection regarding her entitlement to statutory penalties under ERISA is overruled.

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report (DE 254) and incorporates it herein and dismisses Plaintiff's federal law claims and declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

It is, therefore, **ORDERED** that Defendants' Motion for Summary Judgment (DE 212) is granted as to Plaintiff's federal law claims, but the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and remands the same to State court.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Greenville, South Carolina
March 24, 2022